# EXHIBIT 3

**IN THE CIRCUIT COURT OF BOONE COUNTY, MISSOURI**

FILED
BOONE COUNTY

FEB 1 4 2023

CHRISTY BLAKEMORE
CLERK CIRCUIT COURT, COLUMBIA, MO

| | |
|---|---|
| THE CURATORS OF THE UNIVERSITY OF MISSOURI and CAPITAL REGION MEDICAL CENTER, )<br><br>Plaintiffs, )<br><br>v. )<br><br>TEHUM CARE SERVICE, INC. d/b/a CORIZON HEALTH, INC., CHS TX, INC., and YESCARE CORP., )<br><br>Defendants. ) | Case No. 22BA-CV01701-01<br><br>Division 4 |

**[PROPOSED] ORDER GRANTING PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

On December 20, 2022, Plaintiffs The Curators of the University of Missouri and Capital Region Medical Center ("Plaintiffs") filed their Motion for Preliminary Injunction ("Motion") requesting provisional relief under Mo. Rev. Stat. § 428.039, including the appointment of a Receiver to take charge of the assets transferred or of other property of the transferee. Having considered the Motion, supporting briefs, evidence, the record in this matter, and argument of counsel, and for good cause shown, the Court finds that it has jurisdiction over the parties and the subject matter; the legal prerequisites for the appointment of a Receiver have been met; and that equity will be served by the appointment of a Receiver. The Court further finds that _____ is qualified to serve as a Receiver and upon acceptance, is ordered to sign the necessary Oath. The Receiver's bond is determined to be $100,000. This appointment shall become effective within fourteen (14) days of entry of this Order, as long as the requirements stated herein have been met. Nevertheless, if within ten (10) days of entry of this Order, Defendants

CHS TX and YesCare Corp. ("Defendants"[1]) post an injunction bond with one or more sureties approved by the Court in the amount of $13 million, then the appointment of a Receiver shall be rescinded automatically.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The power to appoint a receiver is within the sound discretion of the trial court. *Riegel v. Jungerman*, 597 S.W.3d 695, 702 (Mo. App. W.D. 2019). An abuse of discretion occurs only when the trial court's ruling is "clearly against the logic of the circumstances then before the trial court," and is "so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Id.* (citing *Dieser v. St. Anthony's Med. Ctr.*, 498 S.W.3d 419, 436 (Mo. 2016)).

Under Missouri law, "[w]hen considering a motion for a preliminary injunction, a court should weigh the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between this harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest." *CitiMortgage, Inc. v. Just Mortg., Inc.*, 2013 WL 6538680, at *3 (E.D. Mo. Dec. 13, 2013) (citing *State ex rel. Dir. of Revenue, State of Mo. v. Gabbert*, 925 S.W.2d 838, 839 (Mo.1996)).

To demonstrate likelihood of success on the merits, a movant does not need to show that it ultimately will succeed on its claims, the movant need only show "a fair chance of prevailing." *Id.* (citing *Phelps–Roper v. Nixon*, 509 F.3d 480, 485 (8th Cir. 2007)).

---

[1] To avoid uncertainty, "Defendants" as used in this Order does not include Defendant Tehum Care Service, Inc. d/b/a Corizon Health, Inc., as this Order will specifically refer to "Corizon Health" when referring to this Defendant in particular.

A. **Plaintiffs Have a Fair Chance of Prevailing on Their MUFTA Claim.**

Defendants argue this lawsuit "represents an attempt by Plaintiffs to abrogate the laws of another state," alluding to the Texas Business Organization Code's ("TBOC") divisional merger provisions. But "while the TBOC permits a company to engage in a divisional merger, it does not permit that company to thereby prejudice its creditors. The TBOC explicitly states that the merger provisions do not 'abridge any right or rights of any creditor under existing laws.'" *In re Aldrich Pump LLC*, No. 20-30608 (JCW), 2021 WL 3729335, at \*27 (Bankr. W.D.N.C. Aug. 23, 2021). "This has been the unwavering and stated policy behind the Texas divisional merger statute since it was first adopted." *Id.* Curtis Huff, a "primary author of the Texas divisional merger statute," "has confirmed that the rights of creditors under federal and state fraudulent transfer laws are not abrogated or abridged by such a merger," and that "all laws protecting the rights of creditors with respect to fraudulent conveyances...will remain in full force and apply." *Id.* at 28.

The Missouri Uniform Fraudulent Transfer Act ("MUFTA" or "the Act") was designed to protect unsecured creditors. *BancorpSouth Bank v. Hall*, No. 6:10-CV-03390-DGK, 2011 WL 529971, at \*4 (W.D. Mo. Feb. 7, 2011) (citing *Fleming Companies, Inc. v. Rich*, 978 F. Supp. 1281, 1294 (E.D. Mo. 1997)). MUFTA defines a fraudulent transfer as a transfer made with the "actual intent to hinder[,] delay, or defraud any creditor of the debtor." Mo. Rev. Stat. § 428.024.1(1).

MUFTA "provides remedies directly against transferees." *Enter. Fin. Grp., Inc. v. Podhorn*, 930 F.3d 946, 949 (8th Cir. 2019). Specifically, MUFTA allows creditors seeking relief under this provision to seek, among other things, "[a]n injunction against further disposition by the debtor or a transferee, or both, of the asset transferred or of other property," and "[a]ppointment

of a receiver to take charge of the asset transferred or of other property of the transferee." Mo. Rev. Stat. § 428.039(3).

The preliminary formalities for a MUFTA claim are met, here. Plaintiffs have a "claim" against Defendant Tehum Care Service, Inc. d/b/a Corizon Health, Inc. ("Corizon Health") for unpaid services.[2] Further, Corizon Health's allocation of assets to CHS TX, Inc. constitutes a "transfer" under the Act.[3] The remaining question is whether Corizon Health's transfer of assets was done "with actual intent to hinder, delay, or defraud any creditor of the debtor." Mo. Rev. Stat. § 428.024(a)(1).

While fraudulent intent is rarely proven by direct evidence, this is the rare case in which Defendants' own admissions evidence direct intent to defraud. *See, e.g., CitiMortgage, Inc. v. Just Mortg., Inc.*, 2013 WL 6538680, at *2 (E.D. Mo. Dec. 13, 2013) (explaining badges of fraud are typically used to prove intent because direct evidence of fraud is "rare").

*Schmoll v. ACandS, Inc.* is helpful here. 703 F. Supp. 868, 872 (D. Or. 1988), *aff'd*, 977 F.2d 499 (9th Cir. 1992). In that case, the district court found defendant Raymark Corporation was liable for the debts of its pre-restructuring predecessor, acknowledging statements made by the company evidencing that it carried out the restructuring to escape liability, including:

- "In response to Raymark Corporation's financial difficulties...officers and directors, with the advice of counsel, developed the sophisticated corporate restructuring scheme." *Id.* at 873;

- Raymark Corporation claimed in its annual report that the company's strategy was "to protect and enhance shareholder investment, to maximize the amounts

---

[2] Under the Act, a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Mo. Rev. Stat. § 428.009(2).

[3] Under the Act, a "transfer" is "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and creation of a lien of other encumbrance." Mo. Rev. Stat. § 428.009(12).

available for deserving asbestos-injured claimants, and to limit exposure for asbestos claims only to businesses currently threatened, thus enabling our other businesses and any new business opportunities to grow, unshadowed by the cloud of [] liability." *Id.* at 873-74;

- Raymark Corporation stated the purpose of the restructuring was also "to gain access to new sources of capital and borrowed funds which could be used to finance the acquisition and operation of new business in a corporate restructure." *Id.* at 874.

The Court concluded, on these facts, that "[t]here is no just reason to respect the integrity of these transactions," because "although the corporate restructuring meets the technical formalities of corporate form, it was designed with the improper purpose of escaping asbestos-related liabilities." *Id.* at 874. The Court noted it was "ironic" that while Raymark "pride[s] itself" for not filing bankruptcy, it was "in effect attempting a bankruptcy-like reorganization without affording creditors the protections of a formal bankruptcy." *Id.*

Like in *Schmoll*, Defendants' own statements support a finding of actual intent:

- "The 2022 Corporate Restructuring allowed Corizon to avoid bankruptcy;"[4]

- "Given Corizon's financial position, it did not have the financial wherewithal to satisfy its defaulted secured debt, let alone its unsecured debt and litigation claims....In early 2022, Corizon's Board, with the help of counsel, began considering restructuring alternatives" including "a divisional merger" under the TBOC, which allows corporate entities to "re-allocate assets and liabilities among the resulting entities in a manner that is binding on creditors;"[5]

- "The Company was deeply insolvent and heading towards bankruptcy as a result of mounting litigation expenses related to professional liability claims...Corizon faced several hundred lawsuits at the time of the 2022 Corporate Restructuring...Corizon determined that the fairest and most value-maximizing path forward, which would also maximize the prospects of the Company's former business as a going concern, was to engage in a divisional merger...;"[6]

- Corizon's financial "challenges have negatively impact the Company's ability to retain existing contracts, as well as the Company's ability to win new business.

---

[4] YesCare and CHS TX's Opp. to Pls.' Mot. at ¶ 51.

[5] Corizon's Opp. To Pls.' Mot. at ¶¶ 7-8.

[6] YesCare and CHS TX's Opp. to Pls.' Mot. at ¶ 8.

Competitors with stronger balance sheets have a distinct advantage....For these reasons, Management believes it is critical that the Company...evaluate all available restructuring alternatives."[7]

- **"Why are we making this change?** After digging in, we decided that this was the best path forward—to make a fresh start....This change puts us on stronger financial footing and broadens our access to resources that we have never had"[8]

- "This affords our re-branded organization with...strong financial and leadership stability"[9]

Defendants repeatedly admit that Corizon Health's "decision to undergo the 2022 Corporate Restructuring," was intended to affect Corizon Health's creditors (what Defendants characterize as an intent to "preserve value" for them), and to "maximize the prospect of the Company's former business." *See, e.g.,* YesCare and CHS TX's Opp. to Pls.' Mot. at ¶¶ 1; fn. 21; 25; 31; Corizon's Opp. To Pls.' Mot. at p. 18 ("a key purpose of the divisional merger" was "protect unsecured creditors").

Based on these statements, Plaintiffs have established a fair chance of succeeding on the theory that Defendants acted to defraud, hinder or delay creditors when they executed the Restructuring.

Because fraudulent intent is rarely proven by direct evidence, however, MUFTA also enumerates an "illustrative list" of factors for the determination of actual intent, including whether:

1) The transfer was to an insider;
2) The debtor retained possession or control of the property transferred after the transfer;
3) The transfer was disclosed or concealed;
4) Before the transfer was made, the debtor had been threatened with suit;
5) The transfer was of substantially all of the debtor's assets;
6) The debtor absconded;
7) The debtor removed or concealed assets;
8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred;

---

[7] Corizon's Opp. To Pls.' Mot. at Ex. A.

[8] Pls.' Mot. at Ex. 45.

[9] Pls.' Mot. at Ex. 16.

9) The debtor was insolvent or became insolvent shortly after the transfer was made;

10) The transfer occurred shortly before or after a substantial debt was incurred;

11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

*CitiMortgage, Inc. v. Just Mortg., Inc.*, 2013 WL 6538680, at *2 (E.D. Mo. Dec. 13, 2013) (citing Mo. Rev. Stat. § 428.024.2). "The presence of several badges of fraud raises the presumption that a transfer was fraudulent." *Fink v. Wright (In re Wright)*, 611 B.R. 319, 325 (Bankr. W.D. Mo. 2019); *BancorpSouth Bank*, 2011 WL 529971, at *5 (explaining the presence of several indicia of fraud may indeed give rise to a "strong inference of fraud"). Here, several factors under Mo. Rev. Stat. § 428.024 lend support to Plaintiffs' allegations of fraudulent intent.

Corizon Health transferred its assets to an insider. An insider includes a "director, officer, or person in control of a debtor corporation." Mo. Rev. Stat. § 428.009(7). Corizon Health transferred its assets to CHS TX, organized, directed, and managed by Sara Tirschwell, Corizon Health's former CEO. Tirschwell then sold CHS TX's equity to YesCare Corp., which she also organized and manages. Tirschwell then sold 95% of YesCare Corp.'s equity to YesCare Holdings, LLC, organized by Corizon Health director David Gefner. Each step in this transaction evidences the transfer of Corizon Health's assets to an insider. *See, e.g., Allenspach-Boller v. United Cmty. Bank*, 2021 WL 1738884, at *4 (W.D. Mo. May 3, 2021) (explaining a transfer was to an "insider" where the transferor, Reliable Machine, transferred $1.4 million to the co-owner of Reliable Machine) (citing Mo. Rev. Stat. § 428.009(7)).

For the same reasons, Corizon Health retained possession or control of the assets. Corizon Health director David Gefner controls the company that owns 95% of YesCare Corp.'s equity, of which CHS TX is a wholly-owned subsidiary. Corizon Health director Isaac Lefkowitz retains

authority to authorize the disposition of funds in a YesCare Corp. bank account. These facts reveal Corizon Health maintains control over the assets it purported to transfer.

Further, Corizon Health concealed the transfer from Plaintiffs. Even after revealing its "re-branding," and "name-change" to Corizon Health's active contracts, clients, and employees, Corizon Health concealed this information from Plaintiffs, who did not learn of the restructuring until months into this litigation. *See, e.g., Allenspach-Boller*, 2021 WL 1738884, at *4 (explaining this factor was satisfied where the owners of transferor Reliable Machine did not tell plaintiffs about the transfer).

Plaintiffs threatened Corizon Health with suit before the transfer was made. After multiple attempts to collect the amounts owed, including a notice of breach and an initial demand letter in November 2021, Plaintiffs sent Corizon Health a final demand letter through counsel on April 19, 2022, stating they would pursue legal action if not paid the amounts owed in seven days. Thereafter, Corizon Health reorganized under Texas law, and completed the combination merger, divisional merger, and equity purchase of CHS TX and YesCare Corp. in a matter of days.

The transfer was of substantially all of Corizon Health's assets, including $22.3 million in unsecured funds held by Corizon, LLC. Corizon Health transferred to CHS TX all of its employees, active contracts, and substantially all of its monetary assets. As a result of the restructuring, Corizon Health ceased doing business (because YesCare and CHS TX now conduct said business); has employees (because YesCare and CHS TX employ them); has no headquarters (because YesCare and CHS TX now operate from its headquarters); and has changed its name to "Tehum Care Services, Inc."

Corizon Health was insolvent, or became insolvent as a result of the transfer. Under MUFTA, a debtor is insolvent if the sum of the debtor's debts exceeds the fair value of its assets.

*See* Mo. Rev. Stat. § 428.014 (defining insolvency under Missouri law). In addition, courts presume a debtor is insolvent under Missouri law if the debtor is not paying its debts as they become due. Mo. Rev. Stat. § 428.014.

The existence of the above factors establish a presumption and "strong inference" of fraud, and Plaintiffs have established a fair chance of success on their MUFTA claim. *See, e.g.*, *BancorpSouth Bank*, 2011 WL 529971, at *5 (granting plaintiffs' motion for preliminary injunction, finding plaintiffs were likely to succeed on the merits of their MUFTA claim where four badges of fraud were present); *CitiMortgage, Inc. v. Just Mortg., Inc.*, 2013 WL 6538680, at *4 (E.D. Mo. Dec. 13, 2013) (holding plaintiff was likely to succeed on the merits of its MUFTA claim where "several factors under Mo. Rev. Stat. § 428.024 lend support to plaintiff's allegations of fraudulent intent"); *Allenspach-Boller*, 2021 WL 1738884, at *4 (granting writ of attachment against alleged transferor, finding presence of three MUFTA factors sufficient to establish a fraudulent transfer); *see also Favazza v. Path Media Holdings, LLC*, No. 4:12CV1561 TCM, 2014 WL 1846109, at *10 (E.D. Mo. May 8, 2014) (granting summary judgment for plaintiff on MUFTA claim against Mantra Films for its transfer to GGW where the company "went from Mantra one day to GGW Brands the next day," people employed by Mantra one day were employees of GGW Brands the next; both entities were overseen and run by the same individual; and they continued on the same operations).

Further, the best evidence of a debtor's intent is the effect of the debtor's conduct. *Citizens National Bank v. Cook*, 857 S.W.2d 502 (Mo. App. W.D. 1993). If the necessary consequence of a conceded transaction was defrauding another, then the transaction itself is conclusive evidence of a fraudulent intent. *Id.* (explaining a party cannot be permitted to say that he did not intend the necessary consequence of his own voluntary act). Plaintiffs have submitted sufficient evidence

establishing an effect of Defendants' actions was to "hinder or delay" Plaintiffs from collecting the amounts owed under the Agreement.

*In re Tronox Inc.* is instructive here. 503 B.R. 239, 280 (Bankr. S.D.N.Y. 2013). In that case, which was a non-Texas two-step spinoff, Kerr-McGee Corporation (Old KM) was a chemical and energy company plagued with onerous liabilities. To rid itself of those liabilities, Old KM created a new parent entity, NKM, to which it transferred all of Old KM's equity in its profitable subsidiaries. Old KM retained all of its liabilities, and renamed itself "Tronox." After suit was filed, the court ruled that Defendants were liable for actual and constructive fraud under Oklahoma's Uniform Fraudulent Transfer Act. The court found that it was clear from the evidence that "there can be no dispute that [Old KM] acted to free substantially all of its assets—certainly its most valuable assets—from 85 years of environmental and tort liabilities." *Id.* at 280. The court explained that "[t]he obvious consequence of this act was that the legacy creditors would not be able to claim against 'substantially all of [old KM's] assets,' and with a minimal asset base against which to recover in the future, would accordingly be 'hindered or delayed' as the direct consequence of the scheme." *Id.* at 280; *see also United States v. Spencer*, 2012 WL 4577927 (N.D.Okla. Oct. 2, 2012) (concluding the debtor "admitted his intent to delay collection of the debt" where the defendant testified that he put funds in trust to delay his principal creditor and gain time so he could make enough money to pay the debt); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 386 (S.D. Tex. 2008) (observing that "a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would inevitably be hindered, delayed or defrauded").

So too, here. Plaintiffs have submitted sufficient evidence establishing Corizon Health acted to free substantially all of its assets from years of mounting tort and professional liabilities.

The consequence of this act was that Corizon Health's unsecured creditors would not be able to claim against substantially all of Corizon Health's assets, and with a minimal asset base against which to recover, would consequently be "hindered or delayed." Thus, the effect of Defendants' actions, also, supports this Court's conclusion that Plaintiffs have a fair chance of prevailing on their MUFTA claim.

**B.    Relatedly, Plaintiffs Have a Fair Chance of Prevailing on Their Successor Liability Claims.**

In Missouri, a successor company will be liable for the former company's debt when (1) the transferee expressly or impliedly agrees to assume debts and liabilities, (2) the transaction amounts to a consolidation or merger, (3) the transferee is merely a continuation of the seller, or (4) the transaction is entered into fraudulently to escape liability for the debts and liabilities. *State ex rel. Fam. Support Div. v. Steak'm Take'm LLC*, 524 S.W.3d 584, 590 (Mo. App. W. D. 2017).

In *Nat'l Gypsum*, the District of Massachusetts explained the typical pattern of successor liability:

> a corporation which is solvent (or if technically insolvent, at least some assets to pay its creditors), transfers its assets in a collusive transaction to another entity in which these same shareholders end up with an equity interest, now unencumbered. The transaction is structured so that the selling corporation is either not paid at all, or is paid with stock which is issued directly to its shareholders. The intended result in all cases is the same, to permit the owners of the selling corporation to avoid paying creditors without losing control of their business. It is this intended result which the successor liability exceptions prevent.

*Nat'l Gypsum Co. v. Cont'l Brands Corp.*, 895 F. Supp. 328, 337–38 (D. Mass. 1995). That is the scenario here: Corizon Health transferred its assets to insiders CHS TX and YesCare Corp., thereby retaining an equity interest in those assets, now unencumbered.

Defendants seek to avoid application of successor liability principles by arguing that Texas law applies to the determination, citing the "internal affairs" doctrine. The "internal affairs"

doctrine is a conflict of laws principle that provides the "law of the state of incorporation should be applied to settle disputes affecting the organic structure or internal administration of a corporation." *Enslein as Tr. for Xurex, Inc. v. Di Mase*, 2019 WL 2505052, at \*27 (W.D. Mo. June 17, 2019) (citing *J.Y.C.C. v. Doe Run Res., Corp.*, No. 15-CV-1704, 2019 WL 2211109, at \*8 (E.D. Mo. May 21, 2019) (declining to apply the internal affairs doctrine because the matter did not involve any disputes about internal affairs); *Shaffer v. Health Acquisition Co.*, No. 18-CV-601-NKL, 2019 WL 104932, at \*6 (W.D. Mo. Mar. 5, 2019) (noting the internal affairs doctrine applies to "matters having to do with the internal regulation of a corporation" and does not apply to an action by shareholders on behalf of a corporation seeking to vindicate its rights against third parties); *Aguilar v. PNC Bank, N.A.*, No. 14-CV-985, 2014 WL 12700618, at \*3 n.2 (E.D. Mo. Nov. 19, 2014) (noting Missouri applied the "most significant relationship test" for resolving choice-of-law questions in tort actions and analyzing a claim of aiding and abetting breach of fiduciary duty under this test)).

The doctrine does not, in contrast, apply to issues relating to the way various entities are operated in relation to one another to avoid obligation to third parties. *See, e.g., A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 835 (E.D. Mo. 2018) (holding the purpose of the internal affairs doctrine would not be served by applying it to the veil-piercing claims at issue because "[t]his is not a case involving a fight among shareholders or over the election of corporate officers. Rather, the veil-piercing issue in this case relates to the way the various entities were operated in relation to one another and to Doe Run Peru").[10]

---

[10] Magistrate Judge Patricia Morris with the Eastern District of Michigan recently rejected YesCare and CHS TX's invocation of the "internal relations" doctrine in the successor liability context explaining "the theories at issue here—successorship liability and piercing of the corporate veil— do not involve internal matters" but are "equitable remedies, intended to empower courts to 'disregard traditional corporate law principles' when necessary to 'provide a source of recovery

Missouri, instead, applies the "most significant relationship" test to successor liability determinations. *Osborn v. Prime Tanning Corp.*, 2011 WL 13291159, at *5-6 (W.D. Mo. Apr. 29, 2011) (citing Restatement § 145). The two most significant contacts under Restatement § 145 are (1) the place of injury and (2) the place where the conduct causing injury was located. *Osborn*, 2011 WL 13291159, at *6; *see also* Thomas H. Day, *Solution for Conflict of Laws Governing Fraudulent Transfers: Apply the Law That Was Enacted to Benefit the Creditors*, 48 Bus. Law. 889, 894-95 (1993) (explaining "Courts have rejected the location of the transferee as a significant factor" and "[t]he decision to reject the law of the transferee's location is appropriate because the transferee should not be able to choose laws that favor its receipt of a fraudulent transfer to the detriment of third party creditors, nor should a state's legislature enact laws encouraging its transferees to defraud out-of-state creditors").

Here, the Court finds that Missouri bears the most significant relationship to the issue of successor liability for Plaintiffs' claims against Corizon Health. The place of contracting, and consequently of injury, is Missouri; relating to a longstanding Missouri contract with the University of Missouri to provide correctional healthcare to inmates at the Missouri Department of Corrections. While Corizon Health, YesCare, and CHS TX advocate for application of Texas law, YesCare and CHS TX have no stated connection with Texas other than their incorporation. In fact, their joint principal place of business is Corizon Health's former headquarters in Tennessee. "[W]hen a corporation has little or no contact with [a] state other than the fact that it was incorporated there . . . some other state will almost surely have a greater interest than the state

---

for injured plaintiffs.'" *Kelly v. Corizon Health, Inc.*, Case 2:22-cv-10589, ECF No. 43 at 21 (Nov. 1, 2022) (Morris, M.J.).

of incorporation in the determination of the particular issue." Restatement (Second) of Conflict of Laws, § 302, cmt. g. Thus, Missouri law applies to the determination of successor liability.

In Missouri, several factors are relevant in determining whether a successor company "is merely a continuation" of the predecessor, and is thus liable for its debts: (1) whether there is a common identity of officers, directors, and stockholders; (2) whether the incorporators of the successor also incorporated the predecessor; (3) whether the business operations are identical; (4) whether the transferee uses the same trucks, equipment, labor force, supervisors, and name of the transferor; and (5) whether notice has been given of the transfer to employees or customers. *State ex rel. Fam. Support Div. v. Steak'm Take'm LLC*, 524 S.W.3d 584, 591 (Mo. App. W.D. 2017) (citing *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 804 (8th Cir. 2003)). Even if the two companies do not have common ownership, "the court can find successor liability based on the other factors." *Id.* (citing *Roper Elec. Co. v. Quality Castings, Inc.*, 60 S.W.3d 708, 712-13 (Mo. App. S.D. 2001).

Here, the relevant factors weigh in favor of finding CHS TX and YesCare are a mere continuation of Corizon Health. First, CHS TX and Corizon Health had common owners before YesCare Corp. purchased CHS TX's equity: Valitas Intermediate Holdings, Inc. All of CHS TX and YesCare's officers and directors were formerly officers and directors of Corizon Health. Second, the incorporator of Corizon Health, Inc. (Sara Tirschwell) is the same incorporator for YesCare Corp. and CHS TX. Third, the business operations of all three entities are identical–YesCare and CHS TX continued on with all of Corizon Health's active business. Fourth, YesCare and CHS TX used the same labor force, employees. contracts and clients, headquarters, bank accounts, federal ID numbers, and social media sites as Corizon Health. Last, while notice was

given to the employees and active contracts of Corizon Health, that notice expressed the evolution

from Corizon Health to YesCare was a "name change."

*Med. Shoppe Int'l* is instructive here. In that case, the Eighth Circuit affirmed the district

court's finding that defendant company Pill Dr. was a "mere continuation" of predecessor

company Cape Fear. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 804 (8th Cir.

2003) (applying Missouri law). The evidence established (1) both companies had the same sole

shareholder and director, an individual who was also the president of both corporations; (2) that

same individual incorporated Pill Dr. and her father incorporated Cape Fear; (3) Pill Dr. operated

the same type of business in the same location as did Cape Fear; and (4) although Pill Dr. did not

use the same equipment and trade name as Cape Fear, it operated with the same phone number,

employees, and pharmacist manager. *Id.* at 804-05. The Eighth Circuit explained that the last

factor, whether notification was given to employees and customers, "would weigh against a finding

of a mere continuation, but for the way in which notice was given: 'Only the name has

changed....'" *Id.* at 805. Thus, the Eighth Circuit found that all five factors weighed in favor of

finding Pill Dr. was a mere continuation of Cape Fear, and affirmed the district court's conclusion

that Pill Dr. may be held liable as Cape Fear's successor in interest. Accordingly, the Eighth Circuit

also held the district court did not err in granting plaintiff's motion for preliminary injunction,

explaining "the public interest would not be served by permitting a party to avoid contractual

obligations through the simple expedient of reincorporation under a new name."

Several other cases illustrate YesCare and CHS TX's status as a mere continuation of

Corizon Health. In *Flotte v. United Claims, Inc.*, 657 S.W.2d 387 (Mo. App. E.D. 1983), the

Eastern District affirmed judgment that imposed liability on successor corporation on the basis of

"substantially similar shareholders, officers, and [the new corporation] engag[ing] in the same

business representing the same two major customers." That case involved a suit against defendant United Claims Services, Inc. and its successor, United Claims, Inc. for unpaid wages. Finding the record "amply demonstrates the situation where there was a continuation of a prior transferring corporation," the Eastern District explained: "We cannot in fairness, permit the sole shareholder of one corporation to organize another and transfer all the corporate property from the former to the latter without paying all the corporation's debts. The new corporation can only be regarded as a mere continuation of the former under a different name." *Id.* at 389.

The *Flotte* court concluded: "What remained of the old corporation was a shell of its former self, and effectively, a defunct corporation. The fact that the old corporation did not formerly dissolve does not in and of itself make it any the less extinct as an active entity...upon evidence that the newer corporation was for all intent and purposes the same as the older corporation...." *Id.* at 389. *See also Brockmann v. O'Neill*, 565 S.W.2d 796, 797-99 (Mo. App. St. 1978) (reversing trial court and entering judgment in favor of plaintiff in suit to recover debt under successor liability theory, finding a "continuation of a prior transferring corporation" where both the predecessor and successor companies were in the same business, both had directors, officers, and stockholders in common at the time the predecessor became defunct, the successor used the same trucks, equipment, labor force, and supervisors, and the predecessor took over the successor's contracts with no notice to the contractors).

Likewise, in *Roper*, Defendant QCI defaulted on paying Plaintiff Roper, and subsequently sold its business to Defendant Bagby. *Roper Elec. Co. v. Quality Castings, Inc.*, 60 S.W.3d 708, 710 (Mo. App. S.D. 2001). Roper then sued Bagby for the money that QCI owed, alleging that it was a mere continuation of QCI and, thus, liable for its debts. *Id.* at 710-11. While Bagby and QCI did not have common ownership or incorporators, the court found Bagby to be merely a

continuation because it (1) obtained all of QCI's assets for little or no consideration; (2) retained all vital employees; (3) operated the same business using the same equipment; (4) held itself out to the public using the same trade name; (5) operated in the same location with the same phone number; and (6) failed to notify creditors or customers of any change in ownership. *Id.* at 710-13. Citing *Flotte*, the court held Bagby liable for QCI's debts. *Id.* at 712-13.

Last, in *Steak'm Take'm*, after the purported transfer of all the restaurant's assets from Steak'm LLC to Steak M LLC, Steak M LLC continued running the restaurant as "Steak'm Take'm!" at the same location, with the same equipment, telephone number, menu, key employees, and customers, and neither company notified customers or creditors of the restaurant's change in ownership. *State ex rel. Fam. Support Div. v. Steak'm Take'm LLC*, 524 S.W.3d 584, 591 (Mo. App. W.D. 2017). "Accordingly, as in *Roper*, the court correctly found that Steak M LLC was a "mere continuation of Steak'm LLC and liable for the debts accrued while Steak'm LLC owned the restaurant." *Id.* at 591 (affirming judgment against successor company, explaining the "evidence fully supports the circuit court's conclusions" that defendant was a "mere continuation" liable for the former company's debts).

The same result is warranted here. The totality of the circumstances establish that Plaintiffs have a fair chance of prevailing on the theory that YesCare and CHS TX are mere continuations of Corizon Health and liable for its debts to Plaintiffs. *See Sundance Rehabilitation Corp. v. New Vision Care Assocs. II, Inc.*, No. 04 3571 CV S FJG, 2006 WL 2850556, at *6 (W.D. Mo. Sept. 29, 2006) (granting plaintiff's motion for summary judgment on the issues of successor liability, finding all five factors weighed in favor of find that New Vision was a continuation of Rocky Ridge Manor, Inc. and that C.P. Care Associates, LLC was the mere continuation of New Vision).

Moreover, the relevant factors for determining whether a transaction is a "de facto merger" are: (1) a continuation of management and personnel and general business operations; (2) a continuity of shareholders resulting from the purchasing corporation paying for the assets with shares of its own stock so the selling corporation stockholders become a constituent part of the purchasing corporation; (3) the seller corporation ceasing ordinary business operation and dissolving as soon as possible; and (4) the purchasing corporation assuming those obligations necessary to continue normal, ordinary business operations. *Harashe v. Flintkote Co.*, 848 S.W.2d 506, 509 (Mo. App. E.D. 1993). It is not necessary to find all elements to find a de facto merger. *Id.* ("While the agreement was delineated as a reorganization through a purchase of assets it contained all the elements of a *de facto* merger" thus "W.R. Grace has successor liability for the liabilities of Zonolite").

Here, YesCare and CHS TX have continued on the management, personnel, and business operations of Corizon Health. Corizon Health has ceased its ordinary business operations, and YesCare and CHS TX assumed the obligations necessary to continue the normal, ordinary business operations. Thus, Plaintiffs have a fair chance of prevailing on the theory that YesCare and CHS TX were the result of a "de facto merger" with Corizon Health and are liable for Corizon Health's debts under the Agreement.

## C.     Plaintiffs Will Suffer Irreparable Harm Absent Provisional Relief.

To demonstrate a sufficient threat of irreparable harm the moving party must show that there is no adequate remedy at law, that is, that an award of damages cannot compensate the movant for the harm. *BancorpSouth Bank*, 2011 WL 529971, at *5 (citing *Noodles Dev., LP. v. Ninth Street Partners, LLP*, 507 F.Supp.2d 1030, 1036-37 (E.D. Mo. 2007)).

The signs of fraudulent intent described above "render additional transfers even more likely than in the typical case." *See CitiMortgage, Inc.*, 2013 WL 6538680, at *4. If a preliminary injunction is not issued, Defendants will be free to transfer their assets, and could make it difficult, if not impossible, for Plaintiffs to recover at the conclusion of the litigation if Plaintiffs prevail. *See BancorpSouth Bank*, 2011 WL 529971, at *6 (finding a threat of irreparable harm if the Court failed to enter an injunction where defendants would be otherwise free to create and transfer preferred shares, destroying the control premium associated with owning common stock). Plaintiffs will suffer irreparable harm due to the increased difficulty of recovery caused by any additional transfers. Absent provisional relief, efforts to collect a judgment in Plaintiffs' favor "would likely meet the same fate" as Plaintiffs' efforts to collect the amounts owed under the Agreement in the first place. *See CitiMortgage, Inc.*, 2013 WL 6538680, at *4. Thus, the factor of irreparable harm weighs in Plaintiffs' favor. *See id.* (citing *BancorpSouth Bank v. Hall*, 2011 WL 529971, *6 (W.D. Mo. 2011); *Rodriguez v. Lawns of Distinction, Ltd.*, 2008 WL 4552973, *1 (E.D. Mo. 2008)).

As to the amounts owed under the Agreement, in a prior interrogatory response (and answer), Corizon Health admitted it "owed to Plaintiffs under the Agreement, once billing discrepancies are accounted for, []$11,174,465.50" (Plaintiffs contend they are owed more than $12 million). Although Corizon Health has since amended these responses, it admits that Plaintiffs billed it over $11 million. Moreover, the Agreement provides that interest shall accrue at the rate of 1 percent per month. Accordingly, the Court finds that, with the accrual of compounded interest, it is reasonable to assume that Plaintiffs will request compensation of at least $13 million, assuming the case proceeds to trial this year.

**D.    IV. Plaintiffs Will Suffer Irreparable Harm Absent Provisional Relief.**

MUFTA recognizes the danger that while a plaintiff's fraudulent transfer claim is pending,

the transferee might seek to make further transfers, and protects against that danger by authorizing

the Court to grant appropriate provisional relief. "Irreparable harm occurs when a party has no

adequate remedy at law, typically because its injuries cannot be fully compensated through an

award of damages." *CitiMortgage, Inc. v. Just Mortg., Inc.*, 2013 WL 6538680, at *4 (E.D. Mo.

Dec. 13, 2013); *Haase v. Chapman*, 308 F. Supp. 399, 406 (W.D. Mo. 1969) (finding the plaintiff

may suffer irreparable harm as a result of a fraudulent transfer without the appointment of a

receiver); *see also Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (explaining that "where a

meaningful decision on the merits would be impossible without an injunction, the district court

may maintain the status quo and issue a preliminary injunction to protect a remedy, including a

damages remedy, when the freezing of the assets is limited to the property in dispute or its direct,

traceable proceeds"); *Hilao v. Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994) (joining "majority of

circuits in concluding that a district court has authority to issue a preliminary injunction where the

plaintiffs can establish that money damages will be an inadequate remedy due to impending

insolvency of the defendant or that defendant has engaged in a pattern of secreting or dissipating

assets to avoid judgment."); *Pashaian v. Eccelston Props.*, 88 F.3d 77, 86-87 (2d Cir. 1996)

("preliminary injunction may issue to preserve assets as security for a potential monetary judgment

where the evidence shows that a party intends to frustrate any judgment on the merits by making

it uncollectible.").

Plaintiffs have presented evidence that a meaningful threat exists that Defendants may

render relief in this case meaningless by dissipating assets or removing them from this court's

jurisdiction. *See, e.g., S. New England Tel. Co. v. Glob. Naps, Inc.*, 595 F. Supp. 2d 155, 159 (D.

Mass. 2009) (finding this factor satisfied where the court was "persuaded that, absent an injunction, there is a substantial risk that [the involved company and its owner] would dissipate, conceal, or otherwise secrete assets" where there was "a plethora of circumstantial evidence that [the owner], as well as [the debtors] has been implicated in suspicious business activity"); *Caterpillar Inc. v. Jerryco Footwear, Inc.*, 880 F. Supp. 578, 587 (C.D. Ill. 1994) (finding this element satisfied where, "[c]onsidering the defendants' past intentionally deceptive, bad faith acts," there was a "high probability that, absent a preliminary injunction, the defendants would engage in further acts designed to defraud [the plaintiff] and frustrate any enforcement the Court may enter");[11] *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d 341, 350 (N.D.N.Y. 2001) (explaining plaintiff established a likelihood of irreparable harm by demonstrating defendants' intent to frustrate any potential collection on counterclaims); *Canty v. Morris St. Partners, LLC*, 2006 WL 1769620, at *4 (Pa. Com. Pl. May 23, 2006) ("if Morris Street Partners, LLC were permitted to dispose of any and all remaining assets, Plaintiffs would be subject to irreparable harm as a result of the lack of funds to compensate them for their injuries if they were to receive a jury award").

### E.    The Balance of Harms Weighs in Plaintiffs' Favor.

Although YesCare and CHS TX advance doomsday scenarios if the Court grants provisional relief, the Court finds these arguments speculative and lacking foundation. *See, e.g, Caterpillar Inc. v. Jerryco Footwear, Inc.*, 880 F. Supp. 578, 587 (C.D. Ill. 1994) (noting the defendants "offered no credible evidence" showing injunctive relief caused "any material or

---

[11] Citing *Roland Machinery Co. v. Dresser Industries, Inc.*, 749 F.2d 380, 386 (7th Cir.1984) (irreparable harm may exist where defendant may become insolvent before a final judgment can be collected); *Federal Trade Commission v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1031 (7th Cir. 1988) (freezing defendants assets upheld where assets had been shifted from closely-held corporate defendant to individuals who were sole shareholders of corporate defendant)).

irreparable harm," explaining that the court "has the authority to fashion equitable relief that leaves Defendants in possession of their property and merely establishes control to prevent fraudulent transfers of assets"). These arguments run counter to the representations of YesCare and CHS TX that they are on strong financial footing, generate over $300 million in revenue annually, and are set to begin work on a billion-dollar contract. Thus, the balance of harms weighs in Plaintiffs' favor.

**F.    The Public Interest Supports an Injunction.**

Because Plaintiffs are likely to succeed on their fraudulent transfer claims, the general public interest against fraud is implicated here. *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020). Further, the public has an interest in "enforcing contractual obligations." *Sleep No. Corp. v. Young*, 532 F. Supp. 3d 793, 804 (D. Minn. 2021), *aff'd*, 33 F.4th 1012 (8th Cir. 2022); *Medicine Shoppe Int'l., Inc.*, 336 F.3d at 805 ("[W]e agree that the public interest would not be served by permitting a party to avoid contractual obligations."). Consequently, this factor likewise weighs in favor of preliminary injunctive relief.

Accordingly, the Court GRANTS Plaintiffs' Motion and orders as follows:

## APPOINTMENT OF RECEIVER

Therefore, unless Defendants post an injunction bond in the amount of $13 million within ten (10) days of entry of this Order, it is hereby ORDERED that a Receiver be appointed of Defendants CHS TX and YesCare Corp. ("Defendants"), pursuant to Mo. Rev. Stat. § 515.510, Mo. Rev. Stat. § 428.039, and Mo. Sup. Ct. R. 68.02, to serve with bond. Said Receiver shall take such action as in the best interests of Plaintiffs and other creditors and parties in interest with respect to the Receivership Property, meaning and including any right, title, and interest of Defendants, whether legal or equitable, tangible or intangible, in real and personal property,

wherever located, regardless of the manner by which such rights were or are acquired. Receivership Property shall be limited to assets having a fair market value of $13,000,000. Plaintiffs shall submit the names of at least 2 proposed Receivers by February 17, 2023. All parties will have until February 17, 2023 to submit any additional briefing they wish the Court to consider regarding the scope and authority of the Receiver. If Defendants do not post an injunction bond on or before the expiration of ten (10) days from the date of this Order, the Court will enter a subsequent order specifically naming the Receiver and any further instructions to the Receiver on the scope of their authority.

IT IS SO ORDERED.

Dated: _____            _____
                                         JOSHUA DEVINE
                                         BOONE COUNTY CIRCUIT COURT JUDGE